THIS CONSTITUTES NOTICE OF ENTRY
AS REQUIRED BY FRCP, RULE 77(d).

FILED
CLERK, U.S. DISTRICT COURT

MAR 20 2002

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

Priority _____
Send        X
Enter       X
Closed  _____
JS-5/JS-6 _____
JS-2/JS-3 _____
Scan Only _____

ENTERED
CLERK, U.S. DISTRICT COURT

MAR 21 2002

CENTRAL DISTRICT OF CALIFORNIA
DEPUTY

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SID & MARTY KROFFT PICTURES, INC.<br><br>Plaintiff,<br><br>v.<br><br>ZEEKS, INC., et al.<br><br>Defendants. | Case No. CV 00-12579 RJK<br><br>**ORDER RE: PLAINTIFF'S MOTION FOR SUMMARY ADJUDICATION AND DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

Following oral argument on February 4, 2002, the Court took under submission the Motion for Summary Adjudication of Issues filed by Plaintiff Sid & Marty Krofft Pictures, Inc. ("Plaintiff's Motion") and the Motion for Summary Judgment filed by Defendants Zeeks, Inc., Justin Timberlake, J.C. Chasez, Chris Kirkpatrick, Lance Bass, Wright Entertainment Group and Johnny Wright ("Defendants' Motion"). After considering the papers submitted by the parties, the case file and oral argument, the Court DENIES Plaintiff's Motion and GRANTS Defendants' Motion.

## I. BACKGROUND

This action concerns the right to exploit photographic images of the January 2000 American Music Award ("AMA") performance involving certain 24-

foot tall puppets created in the likeness of the members of the popular musical group 'N SYNC ("Puppets"). The Puppets were used as stage props during 'N SYNC's performance. Certain merchandise bearing the photographic images of the Puppets ("Puppet Merchandise") was sold during 'N SYNC's "No Strings Attached" concert tour ("Concert Tour"). The identified merchandise includes a 23-page 'N SYNC concert program entitled "'N SYNC No Strings Attached Tour 2000," containing five photographs (partial and full shots of the Puppets) taken at the AMA performance and a souvenir backstage pass laminate bearing an image of the Puppets. (Plf.'s Motion at 1, 13; see Declaration of Bruce Isaacs filed January 7, 2002 ("1/7/02 Isaacs Decl."), Exs. M & N.) Plaintiff, the alleged owner of the copyright to the Puppets, seeks to recover a percentage of the revenue generated from those sales.

**A.    The Parties**

Plaintiff is a television and motion picture production company that specializes in programs featuring fanciful puppet characters. Defendants Justin Timberlake, Lance Bass, J.C. Chasez, Chris Kirkpatrick and Joey Fatone, Jr. are five men who perform professionally as the musical group 'N SYNC. Zeeks, Inc., a Delaware corporation ("Zeeks"),[1] holds the right to the 'N SYNC trademark, the right to the individual members' personal services as members of 'N SYNC and the right to exploit their names and likenesses as members of 'N SYNC. (Declaration of Adam Ritholz filed January 14, 2002 ("1/14/02 Ritholz Decl."), ¶¶ 4, 7, 9.)[2]

---

[1]    Hereinafter the five 'N SYNC members and Zeeks collectively shall be referred to as the "Zeeks Defendants."

[2]    Previously, Trans Continental Records, Inc. ("Transcon") held the merchandising rights and the exclusive right to exploit the names and likenesses of the members of 'N SYNC. (Id., ¶ 4.) Transcon also owned the 'N SYNC trademark. (Id.) A lawsuit ensued after the 'N SYNC members formed Zeeks,

1    Defendant Wright Entertainment Group, Inc., an artists' management

2    company, and its principal, Defendant Johnny Wright (collectively, the "Wright

3    Defendants"), provide management services to 'N SYNC pursuant to a

4    management agreement. (Id. at ¶¶ 19-21.)

5    Defendant Winterland Concessions Company (also sued as Winterland

6    Productions, Ltd.) ("Winterland") was at all relevant times the licensee of the 'N

7    SYNC trademark and engaged in the business of manufacturing and selling

8    merchandise bearing the names, likenesses and trademarks of 'N SYNC, among

9    others. (Id. at ¶¶ 5, 10-11.)[3] In January 2001, Winterland filed for voluntary

10

11

12   terminated their recording contract with Transcon and signed a recording contract
     with Zomba Recording Corp. ("Zomba") to release records on Zomba's "Jive"
13   label (hereinafter "Zomba/Jive"). (Id. at ¶¶ 7-8.) On December 29, 1999, the
     lawsuit settled. Pursuant to the settlement agreement, Transcon assigned the 'N
14   SYNC trademark to Zeeks. (Id. at ¶ 9.)
15

16   [3]    Pursuant to two agreements dated as of November 30, 1998 between
17   Transcon and Winterland, Winterland obtained the exclusive right to manufacture
     and sell merchandise bearing the 'N SYNC trademark and the likeness of the band
18   members at concert venues, retail stores and through sub-licensees for a term of
19   years. (Id., Ex. 2 [re "Tour Merchandising"] & Ex. 3 [ re "Merchandising
     Agreement" for "retail/licensing-agency"].) The December 1999 settlement
20   agreement between Transcon and the Zeeks Defendants also assigned the existing
21   Winterland contracts to Zeeks. (Id. at ¶ 9.) By an agreement dated March 8,
     2000, the Zeeks Defendants expanded Winterland's territory from the United
22   States and Canada to worldwide, extended the term of the licensing agreements to
23   November 2002, and changed the Zeeks Defendants' royalties for certain
24   merchandise. (Id., Exs. 2, 3 & 6.) The March 8, 2000 agreement also set a
     schedule for payment of a guaranteed advance of $10 to $12 million to Zeeks.
25   (Id., Ex. 6.)
26         Plaintiff and the Zeeks Defendants now dispute the characterization of the
     March 8, 2000 agreement – Plaintiff refers to it as a new and separate licensing
27   agreement with Winterland, whereas the Zeeks Defendants refer to it as a
28   modification of the pre-existing licensing agreements. This dispute stems, in part,

3

1    bankruptcy in the Northern District of California.[4]

2    **B.    The Creation of the Puppets[5]**

3    In preparation for the 2000 release of 'N SYNC's new album entitled "No

4    Strings Attached,"[6] Zomba/Jive arranged for the group to perform one of the new

5    songs during the AMA show held in Los Angeles on January 17, 2000.[7] (See

6    1/14/02 Ritholz Decl., ¶¶ 26-28.)  Marty Krofft first heard about the potential use

7    of large puppets during 'N SYNC's performance a couple of weeks before the

8    AMA show.  (1/7/02 Isaacs Decl., Ex. C [Krofft Depo.] at 8.)[8]  Mr. Wright called

9

10    _____

11    from the disagreement over whether the Zeeks Defendants profited from the

      allegedly infringing Puppet Merchandise.  For purposes of the motions here, the

12    Court need not resolve this disagreement.  The Court shall refer to the three

      signed agreements collectively as the "Zeeks-Winterland Contract."

13

14    [4]    Therefore, the action against Winterland has been stayed.

15    [5]    All facts regarding the conversations between Plaintiff's principal,

16    Marty Krofft, and 'N SYNC's manager, Mr. Wright, which led to the creation of
      the Puppets are supported only by the deposition testimony of Mr. Krofft.

17    Neither Mr. Wright's declaration nor deposition testimony is in the record before

18    the Court.   The Zeeks Defendants do not appear to dispute the accuracy of Mr.

19    Krofft's recitation of the relevant conversations.

20    [6]    The scene on the compact disc cover depicts the 'N SYNC

21    members as marionettes on a stage:  an image of the members (using actual
      photographs) dangling over a computer or hand-drawn curtained stage – the

22    members' hands and feet are attached to strings.  (See 1/7/02 Isaacs Decl., Ex.

23    D.)

24    [7]    The ABC television network aired the AMA show live on the east

25    coast and tape delayed on the west coast.  (See Declaration of Bruce Isaacs, filed
      January 18, 2002 ("1/18/02 Isaacs Decl."), Ex. 5; Declaration of Al Schwartz, ¶

26    3.)

27    [8]    All citations to deposition transcript pages herein shall refer to the

28    page numbers originally identified in the reporter's transcripts as opposed to the

1    Mr. Krofft and asked if Mr. Krofft could create giant collapsible puppets (in the

2    image of 'N SYNC) for use as stage props in the upcoming AMA performance.

3    (Id. at 15.) Mr. Wright also asked about the cost for such a project. (See id.) In

4    response, Mr. Krofft said, "I have no idea right this moment" but "we can create

5    what this thing is going to look like and then . . . come up with some ballpark of

6    what it's going to cost." (Declaration of Helene Freeman ("Freeman Decl."), Ex. 1

7    [Krofft Depo.] at 15-16.) At that time, Plaintiff had no in-house staff to design

8    and build puppets. (Id. at 16.) For the proposed puppet project, Mr. Krofft

9    decided to contact Chiodo Brothers Productions, Inc. ("Chiodo Brothers"), a

10   company with which Plaintiff has created puppets in the past. (Id.)

11       Randy Pope, an employee of Plaintiff, immediately contacted Edward

12   Chiodo about the possibility of constructing giant collapsible puppets for the

13   AMA performance and a quote. (Id., Ex. 2 [Pope Depo.] at 26.) According to

14   Edward Chiodo, during this initial conversation the two men only discussed the

15   requirements for the proposed puppets, the short time frame for the job and the

16   cost of production. (Id., Ex. 3 [Chiodo Depo.] at 17-19.) Thereafter, Edward

17   Chiodo's brother, Charles, prepared some preliminary artwork for the basic

18   design of the puppets using photographs of the 'N SYNC members found in fan

19   magazines. (Id. at 20, 23-24.) Those sketches were sent to Plaintiff. (See id. at

20   25-26, Ex. 4 [Kempt Depo.] at 30-31 & Ex. 7.)

21       On January 5, 2000, Chiodo Brothers sent Plaintiff a one-page letter

22   confirming that Chiodo Brothers would fabricate five puppets resembling the

23   members of 'N SYNC by January 15, 2000 at $13, 000 per unit. (Id., Ex. 8.) The

24   letter concluded with a statement that "[a] more formal document will be prepared

25   and forwarded later on this week." (Id.) The January 5, 2000 letter is the only

26   ────────────────────

27   page numbers subsequently added to the pages in compliance with the Local
     Rules. See Local Rule 11-5.2 ("a paper exhibit . . . shall be numbered at the
28   bottom of each page consecutively to the principal document").

1  document that memorializes the terms of Chiodo Brothers' engagement before the

2  Puppets were created.

3      After receiving Chiodo Brothers' quote, Mr. Krofft called Mr. Wright on or

4  about January 6, 2000.  During this second telephone call regarding the AMA

5  project, Mr. Krofft advised Mr. Wright that the work could be done and gave him

6  a price.  (Id., Ex. 1 [Krofft Depo.] at 29.)  In the same conversation, Mr. Krofft

7  learned that Mr. Wright had to seek approval from Zomba/Jive before he could

8  close the deal.  (Id. at 29-30 ("And then I found out he wasn't paying for these

9  things, and he had to go to [Zomba/Jive] to get an approval for this thing.  So

10  there was a waste of time between him talking to me and then somebody

11  approving this at [Zomba/Jive].") Thereafter, Zomba/Jive sent Plaintiff a purchase

12  order and reached an agreement on the price.  (Id.)  Zomba/Jive ultimately paid

13  Plaintiff a total of $100,000 for the Puppets.  (See id. at 30, 35.)

14  **C.    The Alleged Merchandising Agreement**

15      The agreement upon which Plaintiff predicates the breach of contract claim

16  was allegedly reached during the second January 2000 telephone conversation

17  between Mr. Krofft and Mr. Wright.  According to Mr. Krofft, the merchandising

18  agreement was based on the following exchange:

19
20      I spoke to [Mr. Wright] when I finally discussed the deal with him,
        and I told him, "Hey, I'm not going to come out on this thing."
21          He said, "*Well, don't worry about it.  You're going to be
        involved with any of the merchandising with the puppets.*

22  (Id. at 18 (emphasis added).)  Alternatively, Mr. Krofft described the same

23  conversation as follows:

24      So the next conversation was me telling [Mr. Wright], after I had
        done the research and the price, saying, "This is about what it's
25      going to cost, and I'm afraid" -- and I must have shown my fear of
        not knowing where we would stand on this thing.   And he said,
26      "*Don't worry about it.  You're going to be in on the merchandising
        with any of the puppets that you do.*"
27

28  (Id. at 29 (emphasis added).)  The record submitted by the parties reflects no

6

1  further communications between the two men, either orally or in writing, wherein

2  they discuss the terms of this alleged merchandising agreement before the AMA.

3  **D.    The Concert Tour**

4          'N SYNC commenced its Concert Tour on May 9, 2000. (1/7/02 Isaacs

5  Decl., Ex. L [Ritholz Depo.] at 14.)  Winterland sold merchandise, including the

6  Puppet Merchandise at issue, at the various concert venues during the tour.

7  Plaintiff's employee Randy Pope saw the merchandise at a performance at the

8  Rose Bowl in June 2000. (Freeman Decl., Ex. 2 [Pope Depo.] at 74-76.)  On or

9  about June 30, 2000, Mr. Krofft wrote a letter to Mr. Wright, stating the following:

> I attended the 'N SYNC concert at the Rose Bowl a few weeks
> back.[9]  Congratulations on such an enormous turn out.  I noticed
> that you were selling Lamenants [sic] with our puppets image on it.  I
> wanted to follow up with you on the merchandising deal you
> promised me at the "AMA's".  As per our discussion at the awards
> show, you promised me a percentage of all merchandising related to
> the puppets we created.  I never pursued it any further because I took
> you at your word.  Please call me so we can resolve this issue.

15  (Id., Ex. 10.)  Mr. Wright did not respond to this letter. (Isaacs Decl., Ex. C

16  [Krofft Depo.] at 54.)

17  **E.    Copyright in the Puppets**

18          On or about July 20, 2000, Plaintiff faxed Chiodo Brothers a proposed

19  "Certificate of Engagement," which set forth, among other terms, that the Puppets

20  shall be deemed "works 'made-for-hire' for [Plaintiff] and [Plaintiff] is and shall

21  be deemed the author and/or exclusive owner of [the Puppets]." (Freeman Decl.,

22  Ex. 11.)  Plaintiff and Chiodo Brothers negotiated some terms (including the

23  provision granting Chiodo Brothers a percentage of Plaintiff's receipts from

24  merchandising proceeds) and executed the agreement a few days later. (See id.,

25  Ex. 3 [Chiodo Depo.] at 49-50, Ex. 11 & Ex. 12.)

---

27          [9]    Notwithstanding this statement, it appears that Mr. Krofft was
28  referring to Randy Pope's visit to the Rose Bowl. (See Isaacs Decl., Ex. C
[Krofft Depo.] at 54.)

On or about July 24, 2000, Plaintiff applied for copyright registration of the
Puppets on the basis that Plaintiff is the author and owner of the "3-Dimensional
sculpture[s]" and the works are "work[s] made for hire." (1/7/02 Isaacs Decl.,
Ex. K.) The Copyright Office accepted the registrations effective July 25, 2000.
(See id.)

## F.    Procedural History

On November 28, 2000, Plaintiff commenced this action. The Complaint
alleges two claims for relief: (1) copyright infringement; and (2) breach of an
implied-in-fact contract. On January 7, 2002, Plaintiff filed its motion seeking
summary adjudication of the Zeeks and Wright Defendants' liability for copyright
infringement. On January 22, 2002, the Zeeks and Wright Defendants filed their
joint opposition. On January 28, 2002, Plaintiff filed its reply.

On January 14, 2002, the Zeeks and Wright Defendants filed a joint motion
for summary judgment, seeking dismissal of all claims. Plaintiff filed its
opposition on January 18, 2002. The Zeeks and Wright Defendants filed a joint
reply on January 28, 2002. The two motions were heard on February 4, 2002.[10]

## II. DISCUSSION

## A.    Summary Judgment Standard

Summary judgment is proper if "the pleadings, depositions, answers to
interrogatories, and admissions on file, together with the affidavits, if any, show
that there is no genuine issue as to any material fact and that the moving party is
entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is material
only if it is relevant to a claim or defense and its existence might affect the suit's
outcome. See T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Assoc., 809
F.2d 626, 630 (9th Cir. 1987).

---

[10]    Hereinafter all references to "Defendants" shall refer to the Zeeks and
Wright Defendants.

1    The moving party bears the burden of demonstrating the absence of a

2    genuine issue of material fact for trial.  See Anderson v. Liberty Lobby, Inc., 477

3    U.S. 242, 256 (1986).  "[T]he burden on the moving party may be discharged by

4    'showing' — that is, pointing out to the district court — that there is an absence

5    of evidence to support the nonmoving party's case."  Celotex Corp. v. Catrett,

6    477 U.S. 317, 325 (1986); see Musick v. Burke, 913 F.2d 1390, 1394 (9th Cir.

7    1990).  To demonstrate that the non-moving party lacks sufficient evidence to

8    entitle it to judgment, the moving party must affirmatively show the absence of

9    such evidence in the record, either by deposition testimony, the inadequacy of

10    documentary evidence or by any other form of admissible evidence.  See Celotex,

11    477 U.S. at 322.  The moving party has no burden to negate or disprove matters

12    on which the opponent will have the burden of proof at trial.  See id. at 325.

13    A non-moving party's allegation that factual disputes persist between the

14    parties will not automatically defeat an otherwise properly supported motion for

15    summary judgment.  See Fed. R. Civ. P. 56(e) (non-moving party "may not rest

16    upon the mere allegations or denials of the adverse party's pleadings, but . . .

17    must set forth specific facts showing that there is a genuine issue for trial.").  "[A]

18    mere 'scintilla' of evidence will be insufficient to defeat a properly supported

19    motion for summary judgment; instead, the nonmoving party must introduce some

20    'significant probative evidence tending to support the complaint.'"  Fazio v. City

21    and County of San Francisco, 125 F.3d 1328, 1331 (9th Cir. 1997) (quoting

22    Anderson, 477 U.S. at 249, 252.)  In judging evidence at the summary judgment

23    stage, courts must draw all reasonable inferences in favor of the party against

24    whom summary judgment is sought.  See Matsushita Elec. Indus. Co. v. Zenith

25    Radio Corp., 475 U.S. 574, 587 (1986); Chaffin v. United States, 176 F.3d 1208,

26    1213 (9th Cir. 1999).

27    **B.    The Court Has Subject Matter Over This Dispute**

28    A prerequisite to an action for copyright infringement is the possession of a

9

1 valid copyright registration. See 17 U.S.C. § 411(a). The Complaint and the

2 copyright registrations incorporated by reference therein allege that Plaintiff is the

3 author, sole owner and copyright holder of the Puppets by virtue of a "work for

4 hire" agreement between Plaintiff and Chiodo Brothers. (Compl., ¶ 14 & Ex. 1.)

5 Defendants first argue that the Court lacks subject matter jurisdiction on the

6 ground that the "work for hire" copyright registrations are invalid. (See Defs.'

7 Motion at 9-13.) Defendants contend that the works and the purported "work for

8 hire" agreement fail to meet the requirements of the Copyright Act. (See Id.)

9 Defendants' argument has no merit.

10        The Copyright Act of 1976 (the "Act") provides that copyright ownership

11 "vests initially in the author or authors of the work." 17 U.S.C. § 201(a). The

12 author is generally the party who actually creates the work. See id. § 102. The

13 Act created an exception to this rule for "works made for hire" (also commonly

14 referred to as "works for hire"). If the work is made for hire, "the employer or

15 other person for whom the work was prepared is considered the author" and

16 owns the copyright, unless there exists a written agreement to the contrary. Id. at

17 § 201(b). "Classifying a work as 'made for hire' determines not only the initial

18 ownership of its copyright, but also the copyright's duration, . . the owners'

19 renewal rights, . . [and the owners'] termination rights[.]" Community for Creative

20 Non-Violence v. Reid, 480 U.S. 730, 737 (1989).

21        Section 101 of the Act provides two definitions of a work for hire:

22        (1)    a work prepared by an employee within the scope of his
   or her employment, or

23

24        (2)    a work specially commissioned for use as a contribution
   to a collective work, as part of a motion picture or other audiovisual
   work, as a translation, as a supplementary work, as a compilation, as

25    an instructional text, as a test, as answer material for a test, or as an
   atlas, *if the parties expressly agree in a written instrument signed by*

26    *them that the work shall be considered a work made for hire.* . . .

27 17 U.S.C. § 101 (emphasis added); see Community for Creative Non-Violence,

28 490 U.S. at 738, 747-48 ("Congress intended to provide two mutually exclusive

ways for works to acquire work for hire status:  one for employees and the other for independent contractors").  Plaintiff *does not claim that the Puppets were created by Plaintiff's employees* within the meaning of § 101(1).  The dispute concerns whether the Puppets, made by an independent contractor, satisfy the requirements of § 101(2).[11]

### 1.    The Work Category Requirement Under § 101(2)

A specially commissioned work may be registered as a work for hire under § 101(2) *only* if the work falls within one of the nine categories enumerated in that subsection.  <u>Community for Creative Non-Violence</u>, 490 U.S. at 738.  Defendants argue that the Puppets do not fit within any of the nine categories because they are registered as "sculptures."  (Defs.' Motion at 11.)

In response, Plaintiff contends that the Puppets fit within the "audio visual work" category[12] because the Puppets were sculptural works "specially ordered or commissioned for use as . . . *a part of* a motion picture *or other audiovisual work . . . .*" 17 U.S.C. § 101(2).  (Plf.'s Opp. at 4-5.)  According to Plaintiff, "it is beyond dispute that the initial purpose in creating the Puppets was to enable 'N SYNC to make use of them as props during their musical performance" at the AMA show, which was aired on live and tape delayed television.  (Plf.'s Opp. at 5.)  In their reply, Defendants argue that the Puppets are part of an "audiovisual work" within the meaning of § 101(2) *only* if Plaintiff either (1) created the

---

[11]    For ease of reference and consistent with other courts' citations in work for hire analyses, all references herein to "§ 101(1)" or "101(2)" shall refer to subsections (1) and (2) under the definition of "works made for hire" in 17 U.S.C. § 101.  <u>See</u>, <u>e.g.</u>, <u>Community for Creative Non-Violence</u>, 490 U.S. at 738.

[12]    "Audiovisual works" are "works that consist of a series of related images which are intrinsically intended to be shown by the use of machines or devices such as projectors, viewers, or electronic equipment, together with accompanying sounds, if any, regardless of the nature of the material objects, such as films or tapes, in which the works are embodied." 17 U.S.C. § 101.

audiovisual work at issue (i.e., the AMA performance) or (2) had a work for hire agreement with the creator of the audiovisual work (e.g., either the producers of the AMA or Zomba/Jive, the recording company) *and then subcontracted* with Chiodo Brothers.[13] (Defs.' Reply at 4-5.)  The Court rejects Defendants' argument.

"The starting point for [a court's] interpretation of a statute is always its language." <u>Community for Creative Non-Violence</u>, 490 U.S. at 739.  Here, the plain language of § 101(2) does not require that the party who "specially ordered or commissioned" the subject work *also* be the actual creator or producer of the "motion picture or other audiovisual work."  The Court is aware of no other provision in the Act that purports to add such a requirement, and Defendants have cited no authority in support of their interpretation.  Because the Puppets were "specially ordered or commissioned for use as part of . . . an audiovisual work," the Puppets satisfy the first element of the Act's "work for hire" definition.

### 2.    The Writing Requirement of § 101(2)

Section 101(2) also requires that "the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire."  The statute is silent as to when the written instrument must be executed. The writing that Plaintiff alleges satisfies this requirement is a "Certificate of Engagement" apparently drafted and signed about seven months after the work was completed.  At issue is whether, as Defendants contend, the writing must *precede* the creation of the subject work in order to meet the statutory requirement of a written "work for hire" contract.  (Defs.' Motion at 12.)  Plaintiff argues that the writing can be *executed* after the work is created so long as it confirms a *prior* work for hire agreement.  (Plf.'s Opp. at 5, n.4; Plf.'s Motion at 8.)

---

[13]    It is undisputed that Plaintiff did not have a work for hire agreement with either Zomba or the producers of the AMA.

1    In Schiller & Schmidt, Inc. v. Nordisco Corp., 969 F.2d 410 (7th Cir.

2  1992),  the Seventh Circuit stated a bright line rule that the written work for hire

3  agreement must precede the creation of the work.  969 F.2d at 412-13.  Because

4  the writing in question was created long after the lawsuit had begun, the court held

5  that § 101(2)'s writing agreement was not met.  Id.

6    Following Schiller & Schmidt, the Second Circuit also addressed the

7  writing requirement in Playboy Enterprises, Inc. v. Dumas, 53 F.3d 549 (2d Cir.

8  1995) ("Playboy").  Declining to follow Schiller & Schmidt's bright line rule, the

9  Playboy court adopted a case-by-case approach to determine whether § 101(2)'s

10  writing requirement was met.  As the Second Circuit explained:

11    We are not convinced . . . that the actual writing memorializing the
    agreement must be executed before the creation of the work.  The
12    Nimmers make a convincing argument in their treatise on copyrights
    that such a requirement could itself create uncertainty.  They argue:
13
    [O]ne can [] imagine claims involving parties each of
14    whom knew of the unanimous intent among all
    concerned that the work for hire doctrine would apply,
15    notwithstanding that some of the paperwork remained
    not fully executed until after creation of the subject
16    work.  In that [] circumstance, the bright line rule could
    frustrate the intent of the parties, and cloud rather than
17    serve the goal of certainty.

18  53 F.3d at 559 (citing 1 Nimmer on Copyright, § 5.03[B][2][b] (1994)).  The court

19  concluded that "the writing requirement of § 101(2) can be met by a writing

20  executed after the work is created if the writing confirms a prior agreement, either

21  explicit or implicit, made before the creation of the work."  Id. (emphasis added).

22    This Court agrees with the approach taken by the Second Circuit.  In the

23  absence of controlling Ninth Circuit authority on this issue, the Court adopts the

24  Playboy test for determining whether Plaintiff can meet the statutory writing

25  requirement.

26    Facts relevant to the Playboy analysis are as follows:  Since 1984,

27  Plaintiff's "Krofft puppets" have been fabricated and produced by contractors.

28  (Freeman Decl., Ex. 1 [Krofft Depo.] at 16 ("I don't need the people in-house,

1   you know.  Krofft puppets are Krofft puppets wherever we build them, you

2   know.")  The "Certificate of Engagement" executed by Plaintiff and Chiodo

3   Brothers provides that the "work for hire" agreement is effective as of January 5,

4   2000.[14]  (Freeman Decl., Ex. 12.)  Edward Chiodo and Paul Kemp, the Chief

5   Operating Officer of Chiodo Brothers, both testified that they understood and

6   agreed from the start of the project that the Puppets would be manufactured by

7   Chiodo Brothers but all the ownership rights in the Puppets would vest with

8   Plaintiff.  (1/7/02 Isaacs Decl., Ex. A [Chiodo Depo.] at 38-40, 55 & Ex. B

9   [Kemp Depo.] at 59-66.)  Mr. Kemp also testified that he understood that "a more

10  formal document" would follow the one page January 5, 2000 letter (setting forth a

11  quote for the Puppets and the anticipated deadlines).  (Id., Ex. B [Kemp Depo.] at

12  16-19.)  As Mr. Kemp explained, "[It is] pretty customary in the industry for a

13  long-form document to come after the fact.  There are numerous jobs that we've

14  done where the job's been completed, and then the long-form contract [was]

15  finalized."  (Id. at 18.)  Defendants offer no evidence to the contrary.[15]

16       It is true, as Defendants assert, that the timing of the written agreement

17  coincided with Plaintiff's demand for a share of profits in the Puppet Merchandise

18  and Plaintiff's intent to file suit.  Nevertheless, the undisputed testimony shows

19  that both the creator of the Puppets and Mr. Krofft, Plaintiff's principal,

20  understood before the creation of the Puppets that Plaintiff would own all rights

21  relating to the Puppets.  Such evidence is sufficient to show that Chiodo Brothers

22  and Plaintiff intended a work for hire relationship before the creation of the work.

23  Therefore, consistent with the guideline set by Playboy Enterprises, the Court

24

25       [14]     Edward Chiodo inserted that date into the draft agreement.  (1/7/02

26  Isaacs Decl, Ex. A [Chiodo Depo.] at 69.)

27       [15]     Schiller & Schmidt is distinguishable.  Among other things, nothing

28  in that opinion suggests that the parties' belated written agreement memorialized a
    prior express or implicit work for hire agreement.  See 969 F.2d at 412.

1   holds that the undisputed facts establish the existence of a valid work for hire

2   agreement.[16]

3          Accordingly, the Court rejects Defendants' argument that the copyright

4   registrations are invalid and subject matter jurisdiction is lacking.  The Court has

5   subject matter jurisdiction over this dispute.

6   **C.      The Zeeks Defendants Are Entitled To Summary Judgment On The**

7   **          Copyright Infringement Claim**

8          It is undisputed that the merchandise at issue was created, manufactured

9   and sold by Winterland, the exclusive licensee of the 'N SYNC trademark and the

10  names and likenesses of the 'N SYNC members.  Plaintiff's copyright claim is

11  premised solely on the theory that Defendants are liable under the vicarious

12  copyright infringement doctrine.  (Plf.'s Motion at 14.)

13         To hold a party liable for vicarious copyright infringement, the plaintiff has

14  the burden of establishing:  (1) direct infringement of the plaintiff's copyright; (2)

15  the defendant had the right and ability to control the infringing activity *and* (3) the

16  defendant derived a direct financial benefit from the infringing activities.  See

17  Fonovisa, Inc. v. Cherry Auction, Inc., 76 F.3d 259, 263 (9th Cir. 1996); A & M

18  Records, Inc. v. Napster, Inc., 239 F.3d 1004, 1022 (9th Cir. 2001) ("Napster");

19  Adobe Systems Inc. v. Canus Productions, Inc., 173 F. Supp. 2d 1044, 1049

20  (C.D. Cal. 2001).  The Court shall refer to the second and third elements – "right

21  and ability to control"[17] and "direct financial benefit" – collectively as the two-

22

23          [16]    In light of this conclusion, the Court need not reach Plaintiff's

24  alternative argument, namely, that a post-litigation assignment agreement

25  successfully transferred to Plaintiff any rights Chiodo Brothers might have had in

26  the Puppets.  (See Plf.'s Motion at 11-13.)

27          [17]    Relevant case law sometimes use the term "supervise" instead of

28  "control" when discussing this "right and ability" prong.  Compare Fonovisa, 76
    F.3d at 262 (discussing right and ability to "control") with Napster, 239 F.3d at

1  prong test for vicarious liability.

2  **1.    Direct Infringement**

3  Plaintiff argues that the Puppet Merchandise constitutes unauthorized

4  "derivative works" within the meaning of the Act. (Plf.'s Motion at 13.) 17

5  U.S.C. § 106 provides that "[s]ubject to sections 107 through 120, the owner of

6  copyright under this title has the exclusive rights to . . . prepare derivative works

7  based on the copyrighted work." For purposes of Defendants' Motion only,

8  Defendants do not dispute that direct infringement by Winterland occurred.

9  (Defs.' Motion at 13.) However, in opposition to Plaintiff's Motion, Defendants

10 raise several arguments challenging the scope of Plaintiff's copyright protection.

11 (See Defs.' Opp. at 9-10.)

12 The Court need not address the direct infringement question. As more fully

13 discussed below, the undisputed facts establish that Plaintiff cannot satisfy the

14 two-prong test for vicarious liability. Therefore, Plaintiff's copyright claim against

15 the Zeeks Defendants must fail.

16 **2.    The Two-Prong Test for Vicarious Liability**

17 The Zeeks Defendants argue that Plaintiff cannot establish either part of the

18 test for vicarious liability. (Defs.' Motion at 15.) Plaintiff argues that the

19 undisputed facts show the two prong test has been satisfied.   (Plf.'s Motion at

20 14-15.)  The Court agrees with the Zeeks Defendants.

21 **a.    The Right And Ability To Control**

22 The amount of control necessary to support a finding of vicarious liability is

23 fact specific. In Fonovisa, the Ninth Circuit addressed for the first time the test

24

25 1022 (citing Fonovisa but referring to right and ability to "supervise"); see also

26 Adobe Systems Inc., 173 F. Supp. 2d at 1053 (analyzing Fonovisa's "right and

27 ability to control" test).  For purposes of this ruling, the Court finds no qualitative

28 difference between supervision and control and, therefore, refer to "control" and
   "supervise" interchangeably.

1  for vicarious copyright infringement.  Fonovisa concerned a lawsuit against

2  Cherry Auction, Inc. and others ("Cherry Auction"), the operators of a swap meet

3  where third party vendors routinely sold counterfeit recordings.  76 F.3d at 260.

4  The district court granted Cherry Auction's motion to dismiss, and the Ninth

5  Circuit reversed on the ground that the allegations, accepted as true, established a

6  valid claim for vicarious copyright infringement.

7      The Fonovisa court held that Cherry Auction had the requisite "right and

8  the ability" to control the third party vendors' infringing activities.  Id. at 262.  In

9  reaching this conclusion, the Ninth Circuit relied on the following facts alleged in

10  the complaint:  (1) Cherry Auction provided security guards who patrolled the

11  premises within which the vendors' small booths were located; (2) Cherry

12  Auction was the promoter and organizer of the swap meet; (3) Cherry Auction

13  controlled the customers' access to the swap meet premises; and (4) Cherry

14  Auction had the right to terminate vendors "for any reason whatsoever" at any

15  time, "and through that right had the ability to control the activities of the vendors

16  on the premises."  Id. at 261, 262.

17      More recently, the Ninth Circuit applied Fonovisa's right and ability to

18  control test in the Internet context.  See Napster, 239 F.3d at 1022-23.  In

19  Napster, recording industry plaintiffs sued Napster, the designer and operator of

20  an Internet web site that permitted and facilitated the distribution (transmission) of

21  copyrighted musical and sound recordings for free.  Id. at 1010-11.  The plaintiffs

22  sought to establish Napster's liability as a contributory and vicarious copyright

23  infringer.  Id. at 1011.  On the plaintiffs' motion for a preliminary injunction, the

24  district court held that the plaintiffs had demonstrated a likelihood of success on

25  the merits of the vicarious liability claim.  In reaching this conclusion, the district

26  court found that Napster had the "right an ability to supervise its users' conduct"

27  based on Napster's representations regarding its methods of blocking users about

28  whom rights holders complain.  Id. at 1023.

17

The Ninth Circuit affirmed the district court's order, holding, <u>inter alia</u>, that Napster had the right and ability to control the infringing activity because "Napster had the right and ability to police its system and failed to exercise that right to prevent the exchange of copyrighted material." <u>Id.</u>  In reaching this holding, the court found that "Napster's ability to block infringers' access to a particular environment for any reason whatsoever is evidence of the right and ability to supervise." <u>Id.</u>  The court also found that the evidence showed that Napster "has the ability to locate infringing material listed on its search indices[] and the right to terminate users' access to the system." <u>Id.</u>  Moreover, the court observed that Napster "has an express reservation of rights policy, stating on its website that it expressly reserves the 'right to refuse service and terminate accounts in [its] discretion, including, but not limited to, if Napster believes that user conduct violates applicable law . . . or for any reason . . . with or without cause.'" <u>Id.</u>

Here, Plaintiff argues that the undisputed facts demonstrate the existence of "the right and ability to supervise the creation of the Puppet Merchandise" manufactured and sold by Winterland under the test set forth in <u>Fonovisa</u> and <u>Napster</u>. (Plf.'s Motion at 14-15.)  First, Plaintiff asserts that Adam Ritholz, Zeeks's Secretary and business lawyer, admitted (during his deposition) that the Zeeks Defendants had the "right and ability to supervise" by virtue of the terms of the Zeeks-Winterland Contract. (Plf.'s Motion at 15; Plf.'s Opp. at 6.)  Second, Plaintiff submits that the Zeeks-Winterland Contract expressly grants the Zeeks Defendants approval rights to all merchandise. (Plf.'s Opp. at 7.)  Third, Plaintiff points to the deposition testimony of Donn Tice, the President and Chief Operating Officer of Winterland since 1997, whereby he confirmed the existence of an approval process. (<u>Id.</u>)

It is true that the Zeeks-Winterland Contract provides certain approval rights and Mr. Ritholz so confirmed during his deposition.  Specifically, a relevant provision in the Zeeks-Winterland Contract provides that: "In addition to the

*product categories* previously approved, the additional *product categories* set out
on Exhibit A are also pre-approved." (1/14/02 Ritholz Decl., Ex. 6 [March 2000
agreement] at 2 (emphasis added).)  The referenced Exhibit A identifies dozens of
product categories, including "[m]arionettes, clocks, collectibles and other
memorabilia, poster scrolls, bags, bandanas, [and] confectionery products." (Id.
at 3.)  The other relevant provision in the Zeeks-Winterland Contract provides
that:

> It is of the essence of this agreement that Licensee . . . *not*
> manufacture any merchandise or products hereunder . . . *without*
> *Licensor's approval*, which may be granted or withheld *at Licensor's*
> *sole discretion*; and . . . *not* manufacture, distribute or sell Licensed
> Products hereunder until Licensor has approved the specific goods
> upon which the Licensed Property is to be affixed hereunder.

(Id., Ex. 2 [November 1998 "Tour Merchandising" agreement], ¶ 2.2 (emphasis
added).)  During his deposition, Mr. Ritholz confirmed the existence of this right
to approve:

> Q    Is 'N SYNC involved in the process of approving what the
>      merchandising items look like?
>
> A    'N SYNC is entitled to under its contract with Winterland.
>
> Q    Was there a system in place to your knowledge where
>      Winterland would work up a prospective merchandising item
>      and then submit it to the appropriate people in the 'N SYNC
>      camp or for their approval?
>
> A    There was such a process, yes.

(1/7/02 Isaacs Decl., Ex. N [Ritholz Depo.] at 18-19.)  The testimony of Mr. Tice,
President and CEO of Winterland, supports Mr. Ritholz's testimony.[18]

_____

[18]    Plaintiff identifies the following portion of Mr. Tice's deposition
testimony:

> Q    . . . When Winterland would create prospective merchandise
>      for the Year 2000 tour, would that prospective merchandise be
>      shown or presented to either the band members of 'N SYNC
>      or their representatives to get their blessing or approval?

Although Plaintiff's evidence indicates that the Zeeks Defendants had a contractual right to approve the merchandise created by Winterland,[19] it falls short of establishing the requisite "right and ability to control" for vicarious liability. The Court holds that the right and ability to control sufficient to establish vicarious copyright liability cannot be established by a mere showing that the Zeeks Defendant had the contractual right to *approve* the merchandise manufactured by Winterland. Something more is required. The record not only lacks that "something more," it also demonstrates that the Zeeks Defendants did *not* have the requisite right and ability to control.

Unlike Cherry Auction in <u>Fonovisa</u> or Napster in <u>Napster</u>, the Zeeks Defendants did not retain the right to police the alleged direct infringer's activities such that they had the ability to prevent the distribution or sale of infringing

---

A      Yes.

(Plf.'s Opp. at 7 (quoting 1/18/02 Issacs Decl., Ex. 5 [Tice Depo.] at 47).) However, Plaintiff has failed to identify any portion of Mr. Tice's deposition testimony setting the foundation for Mr. Tice's affirmative response. It is unclear whether Mr. Tice was involved in the day-to-day operations of the company. Another portion of the deposition transcript submitted by Plaintiff shows, for example, that Mr. Tice lacks personal knowledge as to some of the particulars at issue in this lawsuit. (<u>See</u>, <u>e.g.</u>, <u>id.</u> at 46-47.) Therefore, the testimony is inadmissible on summary judgment and is recited herein for illustrative purposes only.

[19]      The Zeeks Defendants argue that Plaintiff offer no evidence that shows they actually approved of the Puppet Merchandise. (Defs.' Reply at 6.) They contend that under the Zeeks-Winterland Contract, the absence of written approval means the merchandise were automatically disapproved. (<u>Id.</u>) Whether the approval rights were *actually exercised* is besides the point; <u>Fonovisa</u> is concerned with whether the right and ability to control existed. <u>See</u> <u>Fonovisa</u>, 76 F.3d at 263 (discussing <u>Shapiro, Bernstein & Co. v. H.L. Green Co.</u>, 316 F.2d 304, 306 (2d Cir. 1963)).

1    products. The uncontroverted evidence shows that the Zeeks Defendants had no

2    right to police Winterland's activities at the concert venues, no right to bar

3    Winterland from selling any merchandise that it manufactured or offered for sale

4    even if the merchandise were *not approved* by the Zeeks Defendants, and no right

5    to eject Winterland from any concert venue for any reason. (Declaration of Adam

6    Ritholz filed January 22, 2002 ("1/22/02 Ritholz Decl."), ¶¶ 26-30.) The concert

7    venues were controlled solely by the concert promoter and/or the owner of the

8    particular venue. (Id.)[20]

9        Moreover, unlike Cherry Auction and Napster, the Zeeks Defendants did

10   not retain the right to terminate their relationship with the alleged direct infringer at

11   their discretion. See Fonovisa, 76 F.3d at 260, 262; Napster, 239 F.3d at 1023.

12   To the contrary, the Zeeks-Winterland Contract explicitly denies the Zeeks

13   Defendants the right to terminate the licensing agreement for any reason at any

14   time during the licensing term. (1/14/02 Ritholz Decl., Ex. 3 [November 1998

15   Merchandising Agreement], ¶ 18 ("All rights conveyed, granted and assigned to

16   Licensee by this agreement *shall be irrevocable under all or any circumstances*

17   *and shall not be subject to reversion, rescission, termination, or injunction.* In

18   case of breach of this agreement by Licensee or its successors, licensees, or

19   assigns, Licensor's remedy shall be limited to an action at law for damages.")

20   (emphasis added) & Ex. 2 [November 1998 Tour Merchandising Agreement] ("If

21   either party believes the other to be in default, the complaining party shall provide

22   the other with written notice thereof as provided in paragraph 24 above, and the

23

24   _____

25       [20]    In Fonovisa, the court relied on Cherry Auction's ability to police its
     vendors' sales activities and right to eject vendors in finding the "right and ability
26   to control" for purposes of vicarious liability. Fonovisa, 76 F.3d at 262-63.
27   Similarly determinative were Napster's ability to search and locate "infringing
     materials listed on its search indices[] and [its] right to terminate users' access to
28   the system." Napster, 239 F.3d at 1024.

1   party so notified shall have fifteen (15) days within which to cure such default

2   before the complaining party may pursue other remedies."). Under the terms of

3   the contract, if Winterland fails to comply with any of its contractual obligations

4   (e.g., obtain the Zeeks Defendants' approval before manufacturing any 'N SYNC

5   merchandise), the Zeeks Defendants could only give notice and sue for breach of

6   contract. (1/22/02 Ritholz Decl., ¶¶ 26, 30; 1/14/02 Ritholz Decl., Ex. 2 at ¶ 25 &

7   Ex. 3 at ¶ 18.) In other words, Winterland could manufacture and sell

8   merchandise *expressly rejected* by the Zeeks Defendants and the Zeeks

9   Defendants' only recourse would be the commencement of a lawsuit for contract

10  damages.

11          Based on this record, the Court concludes that the Zeeks Defendants did

12  not have the right and ability to control Winterland's allegedly infringing activities

13  as a matter of law. There being no genuine issue for trial with respect to the first

14  prong of the vicarious liability test, the Zeeks Defendants are entitled to summary

15  judgment on the copyright infringement claim in their favor.

16          **b.    Direct Financial Benefit**

17          Even if the Court were to conclude otherwise with respect to the control

18  prong of the test, the Zeeks Defendants would nevertheless prevail on summary

19  judgment. Plaintiff has failed to meet its burden of establishing, at a minimum, that

20  a triable issue of fact exists as to the direct financial benefit prong.[21]

21          Plaintiff argues that the Zeeks Defendants' receipt of $4 million in advances

22  under the licensing agreement is sufficient to show that the Zeeks Defendants

23  received a direct financial benefit from the sale of the allegedly infringing goods.

24  (Plf.'s Motion at 15; Plf.'s Opp. at 8-9.) The receipt of revenues flowing from

25  the relationship between the alleged third party infringer and the direct infringer,

26

27  _____

28  [21]     The Court finds no merit in Plaintiff's attempt to distinguish between
    "direct financial *benefit*" and "direct financial *interest*." (See Plf.'s Opp. at 8.)

1  without more, "cannot be the lesson of <u>Fonovisa</u>." <u>Adobe Systems</u>, 173 F.

2  Supp. 2d at 1050.  To meet the direct financial benefit prong of the test for

3  vicarious liability, the sale of the infringing products must in fact "draw"

4  customers to the venue.  <u>Napster</u>, 239 F.3d at 1023 ("Financial benefit exists

5  where the availability of infringing material 'acts as a "draw" for customers.'")

6  (quoting <u>Fonovisa</u>, 76 F.3d at 263-64); <u>Adobe Systems</u>, 173 F. Supp. 2d at 1050

7  ("The direct financial benefit must stem from the fact that substantial numbers of

8  customers are drawn to a venue with the explicit purpose of purchasing

9  counterfeit goods").  For example, the "draw" in <u>Fonovisa</u> was the availability of

10  "counterfeit recordings at bargain basement prices."  <u>Fonovisa</u>, 76 F.3d at 263.

11  Similarly, the "draw" in <u>Napster</u> was the availability of "free" music recordings.

12  <u>Napster</u>, 239 F.3d at 1023 (holding that the evidence shows Napster attracts more

13  registered users by offering an increasing amount of copyrighted music for free

14  and Napster's future revenue is directly dependent on increases in its user base);

15  <u>see also</u> <u>A & M Records, Inc. v. Napster, Inc.</u>, 114 F. Supp. 2d 896, 921-22

16  (N.D. Cal. 2000) ("[t]he ability to download myriad popular music files without

17  payment seems to constitute the glittering object that attracts Napster's

18  financially-valuable user base").

19      In its attempt to satisfy the "draw" requirement, Plaintiff argues that 'N

20  SYNC merchandise sold only at 'N SYNC concerts acted as a draw for concert

21  goers.  (Plf.'s Motion at 15; Plf.'s Opp. at 10.)  The proposition that concert

22  souvenirs rather than the live performance itself acts as the "draw" for concert

23  goers is difficult to accept.  Moreover, the relevant inquiry is whether 'N SYNC

24  fans were attracted to the concerts because of the availability of the allegedly

25  *infringing goods*.  <u>See</u> <u>Fonovisa</u>, 76 F.3d at 263; <u>Adobe Systems</u>, 173 F. Supp.

26  at 1052 (noting that the "critical issue" is whether "unauthorized," "adulterated" or

27  discounted Adobe software acted as the draw, not simply whether Adobe

28  software acted as the draw).

1    To defeat Defendants' Motion, Plaintiff must introduce "some significant

2    probative evidence tending to support" its claim.  Fazio, 125 F.3d at 1331 (internal

3    quotations omitted).  "[A] mere 'scintilla' of evidence" is insufficient.  Id.  Aside

4    from the speculation of counsel, Plaintiff has offered no probative evidence to

5    support its "draw" argument.[22]  Based on this record, the Court holds that

6    Plaintiff has failed to establish the existence of a triable issue of material fact with

7    respect to the direct financial benefit prong of the test.  There being no genuine

8    issue for trial, the Zeeks Defendants are entitled to summary judgment on the

9    copyright infringement claim.

10

11    _____

12    [22]    Plaintiff submits a spreadsheet to show that the concert program was

13    "a significant draw" for concert goers.  (Plf.'s Opp. at 10 (citing 1/7/02 Isaacs

14    Decl., Ex. P).)  Exhibit "P," created by counsel, summarizes information from

15    documents entitled "Concert Concessions Corp. 'N SYNC Show Settlement" as

16    produced by the Zeeks Defendants.  (1/7/02 Isaacs Decl., ¶ 19.)  According to

17    Plaintiff, the fact that "sales of the Program ($2,448,905) constituted

18    approximately one-fifth (or 20%) of the total sales of all *NSYNC merchandise

19    ($11,412,908)" demonstrates that the concert program was "a significant draw for

20    customers."  (Plf.'s Opp. at 10.)  Accepting Plaintiff's calculations as correct,

21    Plaintiff's evidence does not tend to show that concert goers were drawn to the

22    concerts because concert programs were available.

23       Further, the numbers simply do not have the significance attributed to them

24    by Plaintiff.  For example, Plaintiff's Exhibit P, along with Exhibits O and Q

25    (neither of which are properly authenticated) also show that:  (1) each concert

26    program was priced at $20; (2) approximately 1,640,000 people attended 'N

27    SYNC concerts from January 2000 to December 2000; and (3) the Concert Tour

28    at issue started in May 2000 and ended in December 2000.  (1/7/02 Isaacs Decl.,

Exs. O, P & Q.)  Assuming all 1.6 million concert goers attended concerts during

the period pertinent to this suit, these figures indicate that 122,445 programs were

sold ($2,448,905 divided by $20) and *at most 7.5 percent of all concert goers*

purchased a program (122,445 out of the 1.6 million attendees).  Given that the

23-page program only contains five allegedly infringing photographs, this does not

even constitute a scintilla of evidence showing concert goers were drawn to the

concerts because of the availability of the allegedly infringing goods.

1  **D.    The Wright Defendants Are Entitled To Summary Judgment On The**
2      **Copyright Claim**

3      Throughout its papers, Plaintiff makes no distinction between the Zeeks

4  Defendants and the Wright Defendants, 'N SYNC's manager.  Plaintiff has

5  offered no evidence of any contractual relationship between the Wright

6  Defendants, on the one hand, and Winterland, the party that sold the allegedly

7  infringing goods.   Because Plaintiff has failed to make *any* factual showing that

8  the Wright Defendants had the right and ability to supervise the infringing activity

9  and a direct financial benefit from the infringing activity, the Wright Defendants

10  have shown that their motion should be granted.

11  **E.    The Alleged Implied-In-Fact Contract Claim Is Unenforceable**[23]

12      Plaintiff's breach of the implied-in-fact contract claim is based solely on a

13  few statements made in a single telephone conversation that took place between

14  Mr. Krofft and Mr. Wright on or before January 6, 2000.  (See Plf.'s Opp. at 11;

15  Freeman Decl., Ex. 1 [Krofft Depo.] at 18 ("[Mr. Wright] said, 'Well, don't

16  worry about it.  You're going to be involved with any of the merchandising with

17  the puppets.'") & 29 ("So the next conversation was me telling [Johnny Wright],

18  after I had done the research and the price, saying, 'This is about what it's going

19  to cost, and I'm afraid' -- and I must have shown my fear of not knowing where

20  we would stand on this thing.   And he said, 'Don't worry about it.  You're going

21

---

22     [23]    Although the Complaint asserts a breach of contract claim against
23  "Defendants" generally, both the pleading and Plaintiff's papers allege the
24  existence of a merchandising agreement between Plaintiff and the Zeeks
   Defendants only.  (See Compl., ¶¶ 21-26; Plf.'s Opp. at 11-12 (confirming that
25  the Wright Defendants' role in this claim is that of an alleged agent of the Zeeks
26  Defendants.)   Winterland appears to have no involvement at all.  The Court
   hereby holds that notwithstanding the sloppy usage of the term "Defendants" in
27  the relevant portions of the Complaint, Plaintiff's breach of contract claim is
28  asserted only against the Zeeks Defendants.

1    to be in on the merchandising with any of the puppets that you do.'") Mr. Krofft

2    admits that he had no further discussions with Mr. Wright regarding the alleged

3    merchandising agreement. (Id. at 36.) Mr. Krofft also admits that he never

4    discussed the alleged merchandising agreement with the members of 'N SYNC.

5    (Id. at 94.) Mr. Krofft further admits that after the conversation during which he

6    believes a merchandising agreement was reached, he learned that Mr. Wright had

7    inquired about the Puppets on behalf of Zomba/Jive, the "record company," and

8    Mr. Wright had no authority to accept Mr. Krofft's quote for the creation of the

9    Puppets without Zomba/Jive's approval. (See id. at 29-30.) Nevertheless, based

10    on this scanty record, Plaintiff contends that there exists a triable issue of fact as

11    to the existence of an implied merchandising contract entitling Plaintiff to some

12    percentage of the merchandising royalties stemming from the use of the Puppets.

13    (Plf.'s Opp. at 10-11.)

14        It is hornbook law that "[a]n alleged oral contract with vague and uncertain

15    terms is not binding." Halvorsen v. Aramark Uniform Services, Inc., 65 Cal.

16    App. 4th 1383, 1389 (1998). Here, Mr. Krofft claims that Mr. Wright promised

17    that Plaintiff would be "in" on any merchandising revenues or "involved" in any

18    merchandising plans. The nature and extent of Plaintiff's involvement was never

19    discussed. The consideration, if any, was similarly unstated. Nothing in Mr.

20    Krofft's testimony suggests the existence of mutual assent to a specific and

21    enforceable promise.

22        More importantly, Plaintiff has failed to show that Mr. Wright had authority

23    to bind the Zeeks Defendants in any purported merchandising deal. See California

24    Viking Sprinkler Co. v. Pacific Indemnity Co., 213 Cal. App. 2d 844, 850 (1963)

25    ("[T]he burden of proving agency, as well as scope of the agent's authority, rests

26    upon the party asserting the existence thereof and seeking thereby to charge the

27    principal upon representations of the agent."). First, Plaintiff has failed to offer

28    any evidence indicating that Mr. Wright had actual authority under the

1  management contract to make merchandising contracts for the Zeeks Defendants.

2  As Mr. Krofft testified, he was aware that Mr. Wright was acting on behalf of

3  Zomba/Jive (not 'N SYNC) with respect to the commission and purchase of the

4  Puppets.

5      Second, Plaintiff has failed to offer any evidence indicating the existence of

6  ostensible authority.  Under California law, "[a]n agency is ostensible when *the*

7  *principal* intentionally, or by want of ordinary care, causes a third person to

8  believe another to be his agent who is not really employed by him." Cal. Civ.

9  Code § 2300 (emphasis added).  The record in this case is devoid of any evidence

10  showing the Zeeks Defendants, the principals, did or said anything to Mr. Krofft

11  that could have caused him to believe Mr. Wright had authority to act on their

12  behalf in granting Plaintiff a percentage of the merchandising royalties.  In fact,

13  Mr. Krofft testified that he did not discuss "any business" with any of the group's

14  members.  (Freeman Decl., Ex. 1 [Krofft Depo.] at 94.)  Plaintiff's argument that

15  the "it was certainly reasonable" for Mr. Krofft "to form the impression that [Mr.]

16  Wright had authority to act on behalf of the band members" in this regard is

17  baseless.  (See Plf.'s Opp. at 12.)

18      Because the undisputed facts demonstrate that Plaintiff cannot prevail on its

19  breach of the implied contract claim, the Zeeks Defendants are entitled to

20  summary judgment in their favor.

21              **III. DISPOSITION**

22      For the reasons set forth above, the Court concludes that Defendants are

23  entitled to judgment in their favor on all claims.  Accordingly, the Court hereby

24  GRANTS Defendants' Motion and DENIES Plaintiff's Motion.

25      Within ten days of the entry of this order, Defendants shall lodge a

26  proposed judgment.  Because Winterland remains a defendant in this action, the

27  proposed judgment must be in a form that complies with the requirements of

28  //

1    Federal Rule of Civil Procedure 54(b).  See In re Lindsay, 59 F.3d 942, 950 (9th

2    Cir. 1993); Morrison-Knudsen v. Archer, 655 F.2d 962, 965 (9th Cir. 1981).

3

4    IT IS SO ORDERED.

5

6    DATED:   March **20** , 2002.

7    _____

8                                              ROBERT J. KELLEHER
                                               United States District Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28